UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BRANDON McGRADY,

                Petitioner,

    -vs-

JAMES CONWAY

                Respondent.

_____

**DECISION AND ORDER**
**No. 09-CV-0614T**

## I.   Introduction

*Pro se* petitioner Brandon McGrady ("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered June 1, 2005, in New York State, County Court, Monroe County (Frank P. Geraci, J.), convicting him, after a jury trial, of Murder in the Second Degree (N.Y. Penal Law ("Penal Law") § 125.25 [1]).  Petitioner was sentenced to a term of 25 years to life imprisonment.

For the reasons stated below, habeas relief is denied and the petition is dismissed.

## II.  Factual Background and Procedural History

The charges arise from an incident that occurred on June 30, 2004, wherein 17-year-old Petitioner shot and killed thirty-year-old Corey Stanley ("Stanley" or "the victim") as Stanley ran into the home where Petitioner resided with his mother, father, and six

younger sisters at 62 Trust Street, in the City of Rochester, New York.

At approximately 6:00 p.m. on the date of the shooting, Petitioner was playing dice on the Corner of Trust and Miller Streets with at least four other young men, one of whom was Stanley. Trial Trans. [T.T.] 301, 967. After Stanley disputed the outcome of one roll of the dice, he became enraged and made various threats against Petitioner, Petitioner's family, and his friends. T.T. 301, 968. Stanley also hit Petitioner in the head and hands. T.T. 967. Petitioner tried to walk away from the situation, but Stanley pushed him from behind. T.T. 968. Petitioner then walked away and into 63 Trust Street, a building across the street from Petitioner's home. There, Petitioner found a rifle, brought the rifle downstairs, left it in the doorway, and went back outside onto the porch. T.T. 303, 969.

Stanley, who was still outside on the street, continued to make threats against Petitioner and Petitioner's family. Stanley asked Petitioner if he had a gun, and Petitioner lifted up his shirt to show that he did not have one. When Petitioner indicated that he did not have a gun, Stanley stated, "[i]f you got it, better use it. You better do something, because it be all over tomorrow . . . . It be all over later." Stanley also stated that he was going to "wet everything up," which, according to Petitioner, meant that Stanley was going to "[c]ome by and start

shooting [Petitioner's home] up." T.T. 969. After Stanley made
the threats, Petitioner went back inside of 63 Trust Street and
came outside with the gun. T.T. 970. Stanley stated, "[y]ou
better shoot me . . . cause I'm coming back later. It's going to
be over. It's going to be over for you and your family."
T.T. 970. Then, Stanley turned and ran toward Petitioner's home.
T.T. 262, 846-847, 910-911, 970-971. Petitioner shot at Stanley as
he was running toward the home.[1] T.T. 264, 677-678, 974. Stanley
stumbled and fell to one knee. Thereafter, he continued to run
toward Petitioner's home and up the front porch steps. As Stanley
ascended the stairs to Petitioner's home and front porch,
Petitioner fired at Stanley again, but did not hit him. Petitioner
chased Stanley into his family's house, and Stanley fell just as he
entered the family's living room. T.T. 263-269, 368, 848, 973-975.
While Stanley was on the ground on his back, Petitioner repeatedly
pulled the trigger of the gun. In total, Petitioner fired fifteen
bullets from the gun.[2] According to Petitioner, he "blacked out"
and continued to shoot Stanley because he had "lost it." T.T. 975-

---

[1]     Petitioner testified that he did not shoot at Stanley, but rather
"shot away from him." T.T. 974. However, one of Stanley's gunshot wounds --
amongst various others which were received from the front of the body -- was
received from the back and passed throughout the body, exiting on the right-
lower side of the abdomen. T.T. 677. At trial, the medical examiner
testified that the wound received from the back would have made it "very, very
unlikely" for one to be able to run, given the trajectory of the bullet. T.T.
678.

[2]     At trial, the firearms examiner testified that because of a
malfunction in the rifle, it was possible that up to six bullets could fire
from each pull of the trigger. T.T. 744.

977.  The victim died of multiple gunshot wounds.  T.T. 685.  After the shooting, Petitioner got into a car and drove away from the scene.   T.T. 977.   The murder weapon was recovered later that evening by police from the basement of Petitioner's home. T.T. 476-478, 484.

On July 17, 2004, Petitioner was taken into custody and transported to the police station for questioning.  Hr'g Mins. [H.M.] of 01/21/05 7-8.  There, he was read his Miranda rights, waived them, and proceeded to give police a written statement, wherein he admitted to shooting Stanley in the doorway of his family's home.  H.M. of 02/04/05 11-18, 34-35.

Petitioner was subsequently indicted by a Monroe County Grand Jury and charged with:  Murder in the Second Degree, in violation of Penal Law § 125.25 [1] (intentional murder);  and Murder in the Second Degree, in violation of Penal Law § 125.25 [2] (depraved indifference murder).  See Resp't App. B at 5.  Petitioner pleaded not guilty and proceeded to trial.  Mins. of 11/28/04 at 3.

At the close of his trial, Petitioner was found guilty of intentional murder (Penal Law § 125.25 [1]) and sentenced to a term of 25 years to life imprisonment.  T.T. 1216;  Sentencing Mins. [S.M.] 12.

On November 9, 2007, the Appellate Division, Fourth Department ("Fourth Department"), unanimously affirmed Petitioner's judgment

of conviction, and leave to appeal was denied.  People v. McGrady, 45 A.D.3d 1395 (4th Dep't 2007); lv. denied, 10 N.Y.3d 813 (2008).

This habeas corpus petition followed, wherein Petitioner seeks relief on the basis that he received ineffective assistance of trial counsel.  See Pet. ¶ 22A; Traverse [Tv.], Ground I.  This claim is exhausted and properly before the Court.

## III. General Principles Applicable to Habeas Review

### A.    The AEDPA Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a claim that was "adjudicated on the merits" in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(2).  A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 413 (2000).  The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the

law governing a habeas petitioner's claims to the holdings (not _dicta_) of the Supreme Court existing at the time of the relevant state-court decision. <u>Williams</u>, 529 U.S. at 412; <u>accord</u> <u>Sevencan v. Herbert</u>, 342 F.3d 69, 73-74 (2d Cir. 2002), <u>cert. denied</u>, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. <u>Williams</u>, 529 U.S. at 413; <u>see also</u> <u>id.</u> at 408-10. "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently." <u>Aparicio v. Artuz</u>, 269 F.3d 78, 94 (2d Cir. 2001). Rather, "[t]he state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." <u>Id.</u> This increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." <u>Francis S. v. Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Parsad v. Greiner</u>, 337 F.3d 175, 181 (2d Cir. 2003) ("The

presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), <u>cert. denied sub nom.</u> <u>Parsad v. Fischer</u>, 540 U.S. 1091 (2003).  A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

### B.   Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); <u>see, e.g.,</u> <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 843-44 (1999); <u>accord, e.g.,</u> <u>Bossett v. Walker</u>, 41 F.3d 825, 828 (2d Cir.1994), <u>cert. denied</u>, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." <u>Daye v. Attorney General</u>, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*), <u>cert. denied</u>, 464 U.S. 1048 (1984).

## IV. Petitioner's Claim

Petitioner argues, as he did on direct appeal, that he received ineffective assistance of trial counsel because counsel failed to request that the jury be charged as to the justifiable use of deadly physical force to terminate the commission of a

burglary.   See Pet. ¶ 22A; Tv., Ground I.   The Fourth Department
rejected this claim on the merits, finding that "[Petitioner]
received meaningful representation."   McCrady, 45 A.D.3d at 1396.
As discussed below, this claim is meritless.

The Supreme Court has established the following standard for
ineffective assistance claims:

> First, the defendant must show that counsel's
> performance was deficient. This requires
> showing that counsel made errors so serious
> that counsel was not functioning as the
> 'counsel' guaranteed the defendant by the
> Sixth Amendment. Second, the defendant must
> show that the deficient performance prejudiced
> the defense. This requires showing that
> counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose
> result is reliable. Unless a defendant makes
> both showings, it cannot be said that the
> conviction . . . resulted from a breakdown in
> the adversary process that renders the result
> unreliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).   Thus, to make
out an ineffective assistance of counsel claim, Petitioner must
demonstrate both (1) that his attorney's performance "fell below an
objective standard of reasonableness," id. at 688, and (2) that
"there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have been
different[.]" Id. at 694.   In assessing the reasonableness of
counsel's performance, judicial scrutiny "must be highly
deferential," and the court must "indulge a strong presumption that
counsel's conduct falls within the wide range of reasonable

professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (quotation marks omitted); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998); see also Yarborough v. Gentry, 540 U.S. 1 (2003) (per curiam) ("Counsel has wide latitude in deciding how best to represent a client . . . .").

In assessing counsel's performance, this Court "must conduct an objective review . . . measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" Wiggins v. Smith, 539 U.S. 510 (2003) (citations omitted) (quoting Strickland, 466 U.S. at 688-89)). The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct" and has instead emphasized that "'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Id. at 521 (quoting Strickland, 466 U.S. at 688).

To establish the requisite effect of counsel's performance on the outcome of the proceeding, it is not sufficient if the petitioner shows merely that counsel's errors had "some conceivable effect" on the outcome. Strickland, 466 U.S. at 693. Rather, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." Id. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id. This determination, unlike the determination whether counsel's performance fell below an objective standard of reasonableness, may be made with the benefit of hindsight. See Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

Here, the defense of justification to terminate a burglary was inapplicable to the facts established at trial, even when those facts are viewed in the light most favorable to Petitioner. Under New York law, a person may use deadly physical force to defend against a burglary when the person using the force has a legal right to be on the premises and reasonably believes that a burglary is in progress and that deadly physical force is necessary to stop its commission. See N.Y. Penal Law §§ 35.15(2)(c), 35.20(3). A burglary is committed when one "knowingly enters or remains unlawfully in a building with intent to commit a crime therein." Penal Law § 140.20.

Contrary to Petitioner's contention, the evidence at trial was insufficient to establish that Petitioner killed Stanley while Stanley was attempting to commit a burglary. Rather, the evidence established that Stanley was unarmed at the time of the incident, and that his threats to Petitioner and Petitioner's family were future-oriented in nature. T.T. 1066, 969, 970. Moreover, although Petitioner's testimony established that Stanley ran away

from Petitioner and in the general direction of Petitioner's home, Stanley did so only after Petitioner descended the steps of 63 Trust Street from where he had retrieved a rifle and had advanced toward Stanley.  T.T. 971.  Lawrence Jones ("Jones"), the People's sole eyewitness to the crime, testified that Stanley ran to the middle of Miller and Trust Streets when Petitioner first emerged with the rifle, and that he ran toward Petitioner's home only after having been shot and fell to one knee.  When asked by the prosecution to describe the manner in which Stanley ran after the first shot had been fired, Jones testified that Stanley "had a limp" and was "running scared."  T.T. 262-264.  Additionally, Petitioner testified that as both he and Stanley were running, and by the time Stanley approached Petitioner's home, Petitioner had already fired the three shots at Stanley.  T.T. 1047.  According to the medical examiner, the single shot that struck Stanley from behind inflicted a serious enough wound that it "pass[ed] throughout the body, . . . went through the bone of the spine, blew past the stomach, caused a defect in that, the pancreas, also the left kidney, and the spleen . . . ."  T.T. 677.  Such a wound, the medical examiner testified, would have made it "very, very unlikely" for a person to be able to run.  T.T. 678.  Finally, and rather significantly, Petitioner testified that Stanley's only movement as Stanley lay injured on his back in the threshold of Petitioner's home was that of putting up his hands as Petitioner

-11-

stood over him with the rifle and fired it numerous times. T.T. 1068-1071.

Based on these facts, Petitioner was not entitled to a justification instruction based upon the use of deadly physical force to terminate the commission of a burglary, and his attorney was therefore not ineffective in failing to seek such a charge. Notably, the record reflects that trial counsel requested various jury instructions -- including a general justification charge -- which was given by the trial court. T.T. 1091-1093. Accordingly, this Court cannot find that counsel's failure to further request that the jury be instructed with regard to the justifiable use of deadly force to terminate the commission of a burglary constituted constitutionally deficient performance within the meaning of <u>Strickland</u>.

Moreover, Petitioner cannot show prejudice as a result of counsel's alleged error. Had counsel requested the additional jury instruction, and been given it, there is no reasonable probability that the outcome of the trial would have been different. As discussed above, there was overwhelming evidence presented by the prosecution at trial that disproved a defense of justification based upon termination of a burglary. Thus, the probability of a different result due to counsel's failure to request such an instruction is insufficient to undermine confidence in the proceeding. <u>See, e.g.</u>, <u>Williams v. Conway</u>, No. 02-CV-0755, 2007

U.S. Dist. LEXIS 59550, *56 (W.D.N.Y. Aug. 14, 2007) (finding that habeas petitioner was not prejudiced by trial counsel's failure to request a specific justification instruction because, "given the overwhelming evidence presented by the prosecution that negated the critical element of 'reasonableness' that is present in [all justification defenses], there [was] no reasonable probability that the outcome would have been different had the jury been instructed on the elements" of that particular justification defense.).

Therefore, the Court cannot find that the state court's adjudication of this claim was contrary to or an unreasonable application of Strickland.  The claim is dismissed.

## V.   Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2),  I decline to issue a certificate of appealability. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:      May 2, 2011
            Rochester, New York

-14-